# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

KENDRICK J. BRYANT,     :
   Plaintiff,      :
            :
  v.         :   CIVIL ACTION NO.
            :
GREATER NEW HAVEN TRANSIT  :   3:12-CV-00071-VLB
DISTRICT, ET AL.,      :
   Defendants.    :   MARCH 25, 2014
            :

## MEMORANDUM OF DECISION GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. 26]

### INTRODUCTION

   Before the Court is the motion for partial summary judgment filed by the Defendants Greater New Haven Transit District ("GNHTD" or the "District"), Alan Naudus, and Donna Carter (collectively, the "Defendants") seeking judgment on the Plaintiff, Kendrick J. Bryant's ("Bryant") claims for violation of the Age Discrimination in Employment Act (the "ADEA"), the Rehabilitation Act of 1973 (the "Rehabilitation Act"), and the Americans with Disabilities Act (the "ADA").[1] [Dkt. 26.]  For the reasons stated hereafter, Defendants' motion for partial summary judgment is GRANTED as to all defendants.  Further, as explained below, the Court grants summary judgment in favor of defendants Naudus and Carter on Plaintiff's Title VII claim.  Accordingly, the only claim remaining is Plaintiff's Title VII claim as to defendant GNHTD.

---

[1] Plaintiff also named "Connecticare, Inc." as a defendant in his Complaint. Pursuant to Federal Rule of Civil Procedure 4(m), after notice to the Plaintiff the Court dismissed all claims against Connecticare, Inc. on January 15, 2014 without prejudice, for failure to serve Connecticare, Inc.

## I. FACTUAL BACKGROUND

Plaintiff is an African-American male, who was born in 1969.  [Compl., Ex. 1 at 3; Compl. at 1.]  Plaintiff also had a heart condition during at least some of the relevant times.  [Compl., Ex. 1 at 3.]  Plaintiff was hired by GNHTD as a Transit Driver on November 12, 2004.  [Dkt. 26, Def. 56(a)(1) Statement, ¶ 5.]  GNHTD is a political subdivision of the State of Connecticut that provides special transportation services to disabled and elderly clients.  [Dkt. 26, Def. 56(a)(1) Statement, ¶¶ 1-2.]  GNHTD employs approximately 70 drivers.  [Dkt. 26, Def. 56(a)(1) Statement, ¶ 31.]  The schedules for GNHTD's drivers are set by a software system known as the "Trapeze Program."  [Dkt. 26, Def. 56(a)(1) Statement, ¶ 31.]  This software program is "blind" to the identities of the drivers and the passengers when assigning routes.  [Dkt. 26, Def. 56(a)(1) Statement, ¶ 31.] Defendant Alan Naudus is the Operations Manager of GNHTD and has been employed by the District since February 16, 2004.  [Dkt. 26, Def. 56(a)(1) Statement, Ex. B, Naudus Aff., ¶¶ 4, 7.]  Defendant Donna Carter is Executive Director of GNHTD, and has been since November 1, 1994.  [Dkt. 26, Def. 56(a)(1) Statement, ¶ 16.]  A disciplinary chart attached to the Defendants' Motion for Summary Judgment shows that Plaintiff was disciplined 46 times between February 24, 2005 and January 15, 2010, receiving verbal warnings, admonishments, written warnings, suspensions with reduction in pay, and suspensions without pay.  [Dkt. 26, Def. 56(a)(1) Statement, Ex. A-1.]

In May 2009 the District learned from Plaintiff's cardiologist that Plaintiff had a heart condition that required him to be out of work.  [Dkt. 26, Def. 56(a)(1)

Statement, ¶ 45.]  On June 3, 2009 Plaintiff's cardiologist completed a U.S. Department of Labor Certification of Health Care Provider for Employee's Serious Health Condition, which stated that as of May 23, 2009, Plaintiff was unable to perform certain of his job functions, in particular that Plaintiff would be unable to lift over 10 pounds for at least 1 month, and that Plaintiff would be incapacitated for an unknown length of time.  [Dkt. 26, Def. 56(a)(1) Statement, ¶ 45; Dkt. 26, Def. 56(a)(1) Statement, Ex. A-25.]  On July 31, 2009 Plaintiff's cardiologist sent the District notice that Plaintiff was cleared to return to work, and Plaintiff resumed his full duties on August 1, 2009.  [Dkt. 26, Def. 56(a)(1) Statement, ¶¶ 46-47; Dkt. 26, Def. 56(a)(1) Statement, Ex. A-26.]  The District has no record of Plaintiff requesting any accommodation for his heart condition or informing the District that he was unable to perform his duties.  [Dkt. 26, Def. 56(a)(1) Statement, ¶ 47.] The only other information in the record regarding Plaintiff's health is that the District received a letter from a cardiologist on March 7, 2011, dated February 2, 2011, in which the cardiologist states that he does not believe there should be any limitations on Plaintiff's physical or work-related activities.  [Dkt. 26, Def. 56(a)(1) Statement, ¶ 48.]  Although GNHTD has a "light duty" policy, it offers "light duty" only to employees that suffered an injury that is both compensable under the Connecticut Workers' Compensation Act and chargeable to the District. [Dkt. 26, Def. 56(a)(1) Statement, ¶ 50; Dkt. 26, Def. 56(a)(1) Statement, Ex. A-29.]

On January 26, 2010, Plaintiff's employment with GNHTD was terminated by the District, following Bryant's January 20, 2010 verbal altercation, in violation of the District's Employee Handbook for Drivers, with a passenger riding in

Plaintiff's transit bus.  [Dkt. 26, Def. 56(a)(1) Statement, ¶¶ 8-15.]  The verbal

altercation was overheard by then-District Deputy Director Denise O'Hara.[2]

Plaintiff received copies of the Employee Handbook for Drivers in 2004 and 2005.

[Dkt. 26, Def. 56(a)(1) Statement, ¶ 14.] Plaintiff acknowledges receipt of the

Employee Handbook and knowledge of the policy with which he was charged

with violating.  [Dkt. 31, Def. Opp. Br. at 6; Dkt. 26, Def. 56(a)(1) Statement, ¶¶ 9,

12.]

Plaintiff's termination was appealed by the union to a neutral arbitrator

from the American Arbitration Association.[3]  [Dkt. 26, Def. 56(a)(1) Statement, ¶

20.]  In an opinion dated July 2, 2010, the arbitrator found that Plaintiff's

termination "was not for just cause" and that "Mr. Bryant is entitled to

reinstatement and a final opportunity to demonstrate his suitability for continued

employment."  [Compl., Ex. 2 at 11.]  The arbitrator ordered that Plaintiff be

allowed to return to his position, with seniority restored, but without back pay.

[Compl., Ex. 2 at 11.]  In making her findings, the arbitrator also stated:

> Bryant is entitled to reinstatement and an opportunity to reform, but his
> lack of remorse and lack of self-control and feigned bewilderment about his
> obligations to the riding public (even at arbitration) may be taken into
> account for purposes of remedy.  The message must be delivered to Bryant
> that what he did _was_ wrong and the he _must_ fulfill his responsibilities
> professionally and courteously or he will not have another opportunity to
> drive for the District.

[Compl., Ex. 2 at 10-11.]

---

[2] Ms. O'Hara is now deceased.  [Dkt. 26, Def. 56(a)(1) Statement, ¶¶ 8-15.]
[3] Although the record on summary judgment is not clear on this point, it appears
that the procedure for disciplining employees of GNHTD is governed at least in
part by a Collective Bargaining Agreement that exists between GNHTD and
Teamsters Local 443.  [Dkt. 26, Def. 56(a)(1) Statement, ¶ 17; Dkt. 26, Def. 56(a)(1)
Statement, Ex. C-1.]

Plaintiff returned to work on July 9, 2010.  [Dkt. 26, Def. 56(a)(1) Statement, ¶ 21.]

 After returning to work in July 2010, Plaintiff received further disciplinary actions, [Dkt. 26, Def. 56(a)(1) Statement, ¶ 34; Dkt. 26, Def. 56(a)(1) Statement, Ex. B-4], and raised grievances with certain actions by Defendants, [Compl., Ex. 3 at 2].

 The District requires all drivers, including Plaintiff, to have a valid Connecticut Department of Transportation Medical Card ("DOT Medical Card"). [Dkt. 26, Def. 56(a)(1) Statement, ¶ 22.]  This requirement is published to drivers in a bulletin that states that any driver who "allows their . . . Medical Card to expire . . . will be terminated."  [Dkt. 26, Def. 56(a)(1) Statement, ¶ 23.]  Additionally, GNHTD's Employee Handbook for Drivers states that drivers who allow their DOT Medical Card to expire "will be disciplined in accordance with current policy." [Dkt. 26, Def. 56(a)(1) Statement, ¶ 24.]  On January 25, 2011, Plaintiff reported for work at the District but was ineligible to work because his DOT Medical Card had expired.  [Dkt. 26, Def. 56(a)(1) Statement, ¶ 25.]  The findings of fact in a final summary on Plaintiff's complaint filed with the Connecticut Commission on Human Rights and Opportunities (the "CHRO") indicate that Plaintiff scheduled a doctor's appointment for November 2010 to complete the paperwork necessary to renew his DOT Medical Card.  [Compl., Ex. 1 at 7.]  After the appointment, Plaintiff discovered that the wrong paperwork had been completed, and scheduled a follow up appointment for December 2010.  [Compl., Ex. 1 at 7.]  Plaintiff was late to his December 2010 doctor's appointment, and the appointment had to be rescheduled.  [Compl., Ex. 1 at 8.]  Plaintiff's DOT Medical Card expired on

January 23, 2011.  [Compl., Ex. 1 at 8.]  Plaintiff saw a doctor on January 26, 2011, who completed the physical exam necessary for the DOT Medical Card, but the doctor would not clear Plaintiff to return to work until he was examined by a cardiologist.  [Compl., Ex. 1 at 8.]  On January 27, 2011 Plaintiff contacted the District to explain that he needed to see a cardiologist before he could return to work.  [Compl., Ex. 1 at 8.]  On February 1, 2011, Plaintiff had an appointment with a cardiologist.  [Compl., Ex. 1 at 8.]  That same day, Plaintiff called Defendant Naudus to request that he be given the day off on February 4, 2011.  [Compl., Ex. 1 at 8.]  On February 2, 2011, Plaintiff called Defendant Naudus to inform him that he would not receive his DOT Medical Card until February 7, 2011.  [Compl., Ex. 1 at 8.]  During that call Naudus explained to Plaintiff that his absences to date had been considered unexcused and subject to discipline.  [Compl., Ex. 1 at 8.]  On February 9, 2011 Plaintiff's cardiologist signed a full release to duty clearing Plaintiff to return to work.  [Compl., Ex. 1 at 8.]  Plaintiff was able to return to work as a driver on February 10, 2011 when he presented a valid DOT Medical Card. [Dkt. 26, Def. 56(a)(1) Statement, ¶ 26.]  Pursuant to the District's rules, Plaintiff's absence due to his failure to maintain a valid DOT Medical Card was considered unexcused.  [Dkt. 26, Def. 56(a)(1) Statement, ¶ 2.]

Plaintiff knew he could choose to request leave days during that period, as Plaintiff requested and received a leave day during that period, and Defendant did not consider that day to be an unexcused absence.  [Dkt. 26, Def. 56(a)(1) Statement Ex. A-14 at 2.].  Had he done so, his absences during such leave

periods may have been excused. However, Bryant failed to request all of his available leave.

On February 22, 2011, Plaintiff received a 30-calendar-day suspension without pay as discipline for his failure to have maintained a current DOT Medical Card and the unexcused absences incurred during the period he was ineligible to work because he did not have a valid DOT Medical Card.  [Dkt. 26, Def. 56(a)(1) Statement, ¶¶ 27-28.]  The 30-calendar-day suspension was the equivalent of a 20-working-day suspension.  [Dkt. 26, Def. 56(a)(1) Statement, ¶ 28.]  Plaintiff appealed his suspension through the union grievance process, and the District reduced his suspension to a 10-calendar-day suspension, which resulted in the loss of seven working-days.  [Dkt. 26, Def. 56(a)(1) Statement, ¶ 28.]  On May 9, 2011, the District paid Plaintiff the difference in value between a 20-working-day suspension and a 7-working-day suspension.  [Dkt. 26, Def. 56(a)(1) Statement, ¶ 28.]  On April 4, 2011 Plaintiff submitted a handwritten letter of resignation effective that date.  [Dkt. 26, Def. 56(a)(1) Statement, ¶ 29; Dkt. 26, Def. 56(a)(1) Statement, Ex. A-19.]

In addition to the previously-mentioned arbitration, Plaintiff has pursued a number of administrative actions since his January 2010 termination.  Plaintiff filed a complaint with the CHRO regarding his January 26, 2010 termination on April 15, 2010.  [Dkt. 26, Def. 56(a)(1) Statement, ¶ 30.]  Although it is not clear from the record before the Court on summary judgment, apparently the CHRO case was still pending as of March 22, 2011, at which time Plaintiff filed an Amended Complaint with the CHRO.  [Dkt. 26, Def. 56(a)(1) Statement, ¶ 33;

Compl., Ex. 4 at 3-4.]  On September 9, 2011, the CHRO issued its final summary, in which it determined that "there is reasonable cause for believing that a discriminatory practice has been or is being committed as alleged in the complaint."  [Compl., Ex. 1 at 9.]  On October 13, 2011, at GNHTD's request, the CHRO issued a letter correcting the September 9, 2011 CHRO final summary to clarify that Plaintiff's March 24, 2011 amended CHRO complaint contained no allegation of constructive discharge.  [Dkt. 26, Def. 56(a)(1) Statement, ¶ 55.]  On October 17, 2011 the CHRO issued a "Release of Jurisdiction" letter authorizing Plaintiff to commence a civil action in Connecticut Superior Court within 90 days of receipt of the Release of Jurisdiction.  [Compl. at 7.]

Plaintiff's CHRO complaint and amended CHRO complaint were apparently forwarded by the CHRO to the U.S. Equal Opportunity Employment Commission (the "EEOC").  [Dkt. 26, Def. 56(a)(1) Statement, ¶ 56.]  The record before the Court on summary judgment does not indicate what occurred during any EEOC proceedings, if there were any proceedings before the EEOC; however the record does contain a "Notice of Right to Sue" issued to Plaintiff by the EEOC on November 1, 2011, which authorizes him to file Title VII, ADA, and ADEA claims in federal or state court within 90 days of receipt of the notice.  [Compl. at 8.]

Plaintiff also apparently had multiple state administrative proceedings regarding his unemployment compensation benefits, although again, there is very little on this topic in the record before the Court.  Attached to Plaintiff's Complaint is an undated signature page from an appeals referee decision apparently arising from his January 2010 termination, with case number 468-CC-

10.  [Compl., Ex. 4 at 1.]  Page 2 of that decision is also attached to the Complaint.  [Compl., Ex. 4 at 6.]  The signature page contains the referee's conclusion, which was that "the referee concludes that the preponderance of the evidence does not support a finding that the claimant violated company policy."  [Compl., Ex. 4 at 1.]  The referee ordered that Plaintiff be awarded unemployment benefits effective January 24, 2010, if otherwise eligible.  [Compl., Ex. 4 at 1.]

Also attached to the Complaint is the signature page from another administrative decision, case number 979-BR-10, this one from the "ES Board of Review", which the Court believes to be the Connecticut Department of Labor Employment Security Board of Review.  *See Overview of the Employment Security Appeals Division*, Conn. Dep't of Labor, www.ctdol.state.ct.us/appeals/appeals.htm#board (last visited Mar. 21, 2014).  This appears to be an appeal taken from the referee decision in the case numbered 468-CC-10.  Although only the signature page is in the record, that page contains the disposition of the appeal, affirming the referee's decision, and stating that the Plaintiff[4] was not disqualified from receiving unemployment compensation benefits effective January 24, 2010.

A second appeals referee decision, case number 995-CC-11, is also attached to Plaintiff's Complaint, and includes pages 1, 2 and 4 of the decision, with page 4 being the signature page.  [Compl., Ex. 3.]  This decision has a

---

[4] Neither this administrative decision excerpt, nor the above-referenced excerpt from the case numbered 468-CC-10, refer to Plaintiff's name or any other unique identifier.  However, for the purposes of this summary judgment decision, the Court will assume that these documents refer to Plaintiff as the Defendants do not contend that they do not refer to Plaintiff or otherwise challenge their relevance.

mailing date of August 31, 2011, and is an appeal from a May 5, 2011 administrative decision disqualifying Plaintiff from receiving unemployment compensation benefits effective March 27, 2011, for the reason that Plaintiff "voluntarily quit without good cause attributable to the employer."   [Compl., Ex. 3 at 1.]  The appeals referee reversed the administrator's decision, and found that Plaintiff was eligible to receive unemployment benefits effective February 20, 2011, provided he was otherwise eligible.  [Compl., Ex. 3 at 3.]  The appeals referee found that under Connecticut Unemployment Compensation law, Plaintiff had good cause for resigning his employment because the employment was unsuitable to Plaintiff.  [Compl., Ex. 3 at 3.]  The referee also "[did] not find that the [Plaintiff] has established by a preponderance of the evidence that racial or ethnic animus fueled the underlying relationship with the employer."  [Compl., Ex. 3 at 3.]

        Plaintiff filed his complaint in this Court on January 11, 2012, using the form "Complaint for Employment Discrimination" (the "Form Complaint") provided to the public by the Clerk's office.  This six-page form provides the basic outline of a civil complaint for employment discrimination, with blanks for the litigant to fill in information and some instructions to guide the litigant in completing the form.  The Court will describe the relevant substantive portions of Plaintiff's Form Complaint below.

        Section 3 of the Form Complaint allows a plaintiff to allege claims pursuant to Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Rehabilitation Act, or the ADA simply by placing a mark next to the

applicable statutory reference.  [Compl. at 1.]  The intro to Section 3 provides:

"This action is brought pursuant to [Check all spaces that apply to the type of

claim(s) you wish to assert against the Defendant(s)]:".  [Compl. at 1.]  Mr. Bryant

marked the box next to each of the four statutory references in Section 3.

Section 5 of the Form Complaint allows litigants to specify the act(s) they

are complaining of in their litigation.  The introduction to Section 5 reads: "The

acts complained of in this suit concern [Check all spaces that are applicable to

your claim(s)]:".  [Compl. at 2-3.]  Section 5 provides a plaintiff with four choices:

(1) "Failure to hire me."; (2) "Termination of my employment."; (3) "Failure to

promote me."; (4) "Other acts as specified below."   [Compl. at 2-3.]  Plaintiff

marked the selection "Termination of my employment.  I was terminated from my

employment on the following date:"; Plaintiff filled in the date January 26, 2010 in

the space provided.  [Compl. at 2.]  Plaintiff also marked the selection "Other acts

as specified below", and wrote in the space provided: "Continuous Harassment

[sic] in the form of false accusations and unjust discipline. Causing physical,

emotional pain and anguish.  also [sic] Financial [sic] hardship.  See Evidence

attached.  Wrongful Termination".  [Compl. at 3.]

Section 6 of the Form Complaint instructs a litigant to "check all applicable

bases for your claim of discrimination and explain further, if necessary."  [Compl.

at 3.]  Of the seven choices offered, Plaintiff marked race, color, age, and

disability.  [Compl. at 1.]  In the space provided for further explanation, Plaintiff

wrote "Determination of Final Summary of Reasonable cause [sic] CHRO".

[Compl. at 3.]

11

Section 7 of the Form Complaint provides space for a litigant to describe "[t]he facts surrounding my claim of employment discrimination", suggesting that a litigant "[a]ttach additional sheets, if necessary."  [Compl. at 3.]  Plaintiff did not provide any sort of factual narrative in this section.  Rather, he wrote "Please see Attached Evidence", and provided a list of the items attached as exhibits to his Complaint: "American Arbitration association [sic] Wrongful Termination Case 1230013210[;] Decision of appeals [sic] Ref Wrongful Termination Case 995 CC 11 [and] Constructive Discharge case 468 CC 10[;] Decision of ES Board of review [sic] 979 BR 10[;] Determination C.H.R.O. Finding of Reasonable cause [sic] 1030323[;] Amended Complaint 1030323 Constructive Discharge/retaliation."  [Compl. at 3.]  There is no reference to any statement either reflective or suggestive of animus toward any protected class and thus no facts giving rise to an inference of discrimination against any protected class, including any class in which the Plaintiff falls, in any of the documents attached by the Plaintiff to his complaint in lieu of a recitation of fact.

Section 9 asks a litigant to provide the date or time period of the alleged discrimination.  Mr. Bryant wrote in the space provided "2008-2011."  [Compl. at 3.]

Finally, Section 14 of the Complaint asks the Plaintiff to mark "each form of relief you seek", providing five options: (1) "Injunctive orders"; (2) "Backpay"; (3) "Reinstatement to my former position"; (4) "Monetary damages", with instructions to "specify the type(s) of monetary damages sought" in the space provided; and (5) "Other," with instructions to "specify the nature of any

additional relief sought, not otherwise provided for on this form."  [Compl. at 4-5.]
Mr. Bryant marked the selections for backpay, monetary damages, and "other."
[Compl. at 4-5.]  For monetary damages, he wrote in the space provided "Over
100,000 [sic] Discrimination, Retaliation for filing a complaint with CHRO".
[Compl. at 5.]  In the space provided to flesh out the "other" selection, Plaintiff
wrote "Constructive Discharge, Wrongful Termination Over [sic] 150,000 Back
pay 25,000 plus".  [Compl. at 5.]

"A document filed pro se is to be liberally construed and a pro se
complaint, however inartfully pleaded, must be held to less stringent standards
than formal pleadings drafted by lawyers.'" *Boykin v. KeyCorp*, 521 F.3d 202, 214
(2d Cir. 2008) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)).  In accordance
with this standard, the Court has construed the complaint to allege all claims
which may reasonably be inferred.

## II. STANDARD OF REVIEW

Summary judgment should be granted "if the movant shows that there is
no genuine dispute as to any material fact and the movant is entitled to judgment
as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of
proving that no factual issues exist.  *Vivenzio v. City of Syracuse,* 611 F.3d 98,
106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is
required to resolve all ambiguities and credit all factual inferences that could be
drawn in favor of the party against whom summary judgment is sought."  *Id.*
(citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Matsushita
Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).  "If there is any
evidence in the record that could reasonably support a jury's verdict for the

nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315-16 (2d Cir. 2006) (internal quotation marks and citation omitted).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.  At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch–Rubin v. Sandals Corp.,* No. 3:03-cv-00481, 2004 U.S. Dist. LEXIS 22112, at *4 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, 817 F. Supp. 2d 28, 37 (D. Conn. 2011).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie.  *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712, 726-27 (2d Cir. 2010).

## III.  DISCUSSION

### A. Individual Defendants

As an initial matter, the Court notes that Plaintiff cannot bring claims under the ADEA, the Rehabilitation Act, the ADA, or Title VII against individual defendants.  *See Stankovic v. Newman, et al.*, No. 3:12-cv-399, 2013 U.S. Dist. LEXIS 180566, at *5 (D. Conn. Dec. 27, 2013) ("There is no individual liability under

Title VII, the ADEA, or the ADA) (citation omitted); *Nelson v. City of New York*, No. 11 Civ. 2732, 2013 U.S. Dist. LEXIS 117742, at *47 (S.D.N.Y. Aug. 19, 2013) ("It is well established that there is no individual liability under the ADA or the Rehabilitation Act.") (citing *Fox v. State Univ. of New York, et al.*, 497 F. Supp. 2d 446, 449-50 (E.D.N.Y. 2007).  Therefore, the Court sua sponte grants summary judgment in favor of Defendants Naudus and Carter as to all claims, including Plaintiff's Title VII claim. *Cf. Johnson v. N.Y. State Dep't of Corr. Servs. & Cmty*, No. 11-cv-79S, 2012 U.S. Dist. LEXIS 49711, at *10 (W.D.N.Y. Apr. 9, 2012) (dismissing sua sponte Plaintiff's Title VII causes of action against individual defendants) (citations omitted); *Saaidi v. CFAS, LLC*, 740 F. Supp. 2d 357, 363 (N.D.N.Y. 2010) (same) (citing *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004)).

## B.  ADEA CLAIMS

The ADEA provides that "[i]t shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1) (2014). The ADEA's prohibition against discrimination based on age protects employees who are at least forty years of age. 29 U.S.C. § 631(a) (2014).

The Court can identify four possible ADEA claims in Plaintiff's Complaint: (1) a disparate treatment claim rising out of his January 2010 termination and/or his February 2011 suspension; (2) a retaliation claim based on alleged retaliation that occurred after Plaintiff returned to work in July 2010, continuing through his

resignation in April 2011; (3) a hostile work environment claim; (4) a constructive discharge claim related to his April 2011 resignation.

## 1. Disparate Treatment Claim

In the Second Circuit ADEA disparate treatment claims are analyzed using the burden-shifting framework for Title VII claims set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as slightly modified by the Supreme Court's subsequent decision in *Gross v. FBL Financial Services*, 557 U.S. 167 (2009). *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 105-06 (2d Cir. 2010).[5] Under this framework, the plaintiff bears "the initial burden of establishing a prima facie case of discrimination." *Id.* at 106 (citing *McDonnell Douglas*, 411 U.S. at 802). Plaintiff's burden for establishing a prima facie case is de minimis. *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005) ("We have characterized plaintiff's prima facie burden as minimal and de minimis.") (quotation omitted). "If the plaintiff does so, the burden shifts to the defendant to articulate 'some legitimate, nondiscriminatory reason' for its action." *Gorzynski*, 596 F.3d at 106 (quoting *McDonnell Douglas*, 411 U.S. at 802). If the defendant then articulates a legitimate, nondiscriminatory reason for its action, the plaintiff "can no longer rely on the prima facie case, but may still prevail if she can show that the employer's determination was in fact the result of discrimination." *Id.* (citing *Holcomb v. Iona College*, 521 F.3d 130, 138 (2d Cir. 2008)). Finally, under the

---

[5] Although the Supreme Court noted in *Gross* that it had "not definitively decided whether the evidentiary framework of [*McDonnell Douglas*] utilized in Title VII cases is appropriate in the ADEA context," 557 U.S. at 175 n.2, the Second Circuit concluded post-*Gross* that the *McDonnell Douglas* framework still applies to ADEA claims, *see Gorzynski*, 596 F.3d at 106.

Supreme Court's decision in *Gross*, "'a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the but-for cause of the challenged adverse employment action' and not just a contributing or motivating factor." *Id.* (quoting *Gross*, 557 U.S. at 180).

a.  Prima Facie Case

In order to establish a prima facie case of age discrimination, a plaintiff must show "(1) that [he] was within the protected age group, (2) that [he] was qualified for the position, (3) that [he] experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination."  *Gorzynski*, 596 F.3d at 107 (citing *Carlton v. Mystic Transp., Inc., et al.*, 202 F.3d 129, 134 (2d Cir. 2000)).  The burden of establishing a prima facie case is "not a heavy one."  *Id.* (citing *Carlton*, 202 F.3d at 134).

Defendants do not contest that Plaintiff satisfies the first three elements of a prima facie case: he was over 40 at the time he was terminated in February 2010, he was qualified for the position, and he experienced adverse employment action, namely being terminated in January 2010.  *See McInnis v. Town of Weston*, 458 F. Supp. 2d 7, 13 (D. Conn. 2006) (noting that "the Second Circuit has long held that a suspension without pay, for which a plaintiff receives no backpay, is an adverse employment action sufficient for a retaliation claim.") (citing *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)).  However, Plaintiff was not qualified for his position during the period relevant to his February 2011 suspension because he was ineligible to work because he did not have a DOT Medical Card.   Defendants assert that Plaintiff has not satisfied the fourth

element of a prima facie case, as he has failed to produce evidence sufficient to show that he was terminated under circumstances giving rise to an inference of discrimination.

"It is well-settled that an inference of discriminatory intent may be derived from a variety of circumstances, including . . . the more favorable treatment of employees not in the protected group." *Trachtenberg v. Dep't of Educ.*, 937 F. Supp. 2d 460, 470 (S.D.N.Y. 2013) (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)).  Although the words "disparate treatment" do not appear anywhere in Plaintiff's Complaint or his opposition to the motion for summary judgment, it appears that Plaintiff is alleging disparate treatment, that he was punished more severely than a similarly-situated younger employee.  In response to Defendants' interrogatory asking Plaintiff to identify "each act or omission of the Defendants alleged by [his] Complaint to have constituted employment discrimination based upon age", Plaintiff wrote "CHRO Case 1030323."  [Dkt. 21, Ex. 1 at 4.]  In response to the interrogatory asking him to identify each District employee younger than 40 that was treated more favorably than himself, Plaintiff wrote "Andrew Brooks."  [Dkt. 21, Ex. 1 at 5.]  The opinion in the CHRO case referred to by Plaintiff in his interrogatory answer provides a comparison of the severity of the discipline received by both Plaintiff and Andrew Brooks, and thus it appears that Plaintiff is attempting to assert a disparate treatment claim under the ADEA.

"An employee is similarly situated to co-employees if they were (1) 'subject to the same performance evaluation and discipline standards' and (2) 'engaged in

comparable conduct." *Trachtenberg*, 937 F. Supp. 2d at 471 (quoting *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493-94 (2d Cir. 2010)).  "[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical. In other words, the comparator must be similarly situated to the plaintiff in all material respects." *Trachtenberg*, 937 F. Supp. 2d at 471 (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000)).  "Ordinarily, the question whether two employees are similarly situated is a question of fact for the jury." *Mandell v. Cnty. Of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003).  "[T]o satisfy the all material respects standard for being similarly situated, a plaintiff must show that his co-employees were subject to the same performance evaluation and discipline standards." *Aiello v. Stamford Hosp.*, No. 3:09cv1161, 2011 U.S. Dist. LEXIS 87121, at *41 (D. Conn. Aug. 8, 2011) (citing *O'Hazo v. Bristol-Burlington Health Dist.*, 599 F. Supp. 2d 242, 258 (D. Conn. 2009)).

The only identifying information about Brooks provided by Plaintiff is the fact that he is Caucasian, and that he has no disability.  [Compl., Ex. 1, ¶ 16.] However, Defendant has asserted that it is undisputed that Brooks was born in 1972, and that he was employed as a Transit Driver, the same position as Plaintiff. [Dkt. 26, Def. 56(a)(1) Statement, ¶ 41.]  Brooks was hired as a Transit Driver on September 1, 2000, and was terminated by the District on February 27, 2008, at age 35.  [Dkt. 26, Def. 56(a)(1) Statement, ¶ 41.]

The only evidence Plaintiff provides to support his claim of disparate treatment is the findings of fact made in the September 9, 2011 CHRO Opinion

(the "CHRO Opinion"). The CHRO Opinion's findings of fact notes that "Complainant claims Andrew Brooks . . . (white, no disability) allegedly committed similar offenses on numerous occasions and was not terminated immediately."  [Compl., Ex. 1, ¶ 16.]  After noting that both Plaintiff and Brooks "were disciplined on numerous occasions for excessive tardiness", the CHRO Opinion provides a list of numerous disciplinary actions taken against both Plaintiff and Brooks, along with a very brief description of the facts surrounding each disciplinary action.  It is not clear from the CHRO Opinion whether this is a comprehensive review of Plaintiff and Brooks' disciplinary records or merely the relevant highlights.  The CHRO Opinion's findings of fact describe a long list of instances in which clients complained that Brooks had acted inappropriately, but for which Brooks had received discipline that fell short of termination, including written warnings and suspensions.  [Compl., Ex. 1, ¶¶ 29-53.]  By comparison, although the CHRO Opinion's findings of fact note several disciplinary actions taken against Plaintiff prior to the January 2010 incident that resulted in Plaintiff's termination, [Compl., Ex. 1, ¶¶ 19-25], none of the incidents prior to January 2010 are described in the CHRO Opinion as involving inappropriate behavior toward a client.

The CHRO Opinion's findings of fact note that Brooks "was written up for inappropriate and egregious behavior towards client riders frequently and incessantly throughout his employment with GNHTD before he was finally terminated for misconduct and inappropriate behavior towards a supervisor."  [Compl., Ex. 1, ¶ 28.]  The CHRO Opinion also notes in the findings of fact that

although complaints about Brooks were "egregious and frequent," Defendants' "reason for not terminating Brooks was that the allegations against Brooks . . . were a matter of hearsay evidence while Complainant's conduct was immediately witnessed by a supervisor.  [Compl., Ex. 1, ¶ 56.]  Additionally, the Defendants assert in their summary judgment brief that although Brooks was disciplined "several times" for alleged conduct toward passengers, none of these incidents were witnessed directly by any other employees of the District, and that Brooks denied the alleged conduct when asked.  [Dkt. 26 at 11.]  The District felt that they could not terminate Brooks without direct evidence of his behavior provided by a District employee, as the District believed that there was a strong likelihood that any termination would lead to an arbitration, at which the testimony of one of their elderly and/or disable clients would be required.  [Dkt. 26 at 11.]  The District was unwilling to take action that might require such testimony by their clients.  [Dkt. 26 at 11.]  The District asserts that once Brooks' behavior was witnessed by a manager, Brooks was terminated.  [Dkt. 26 at 12.]

Plaintiff has not produced evidence sufficient to allow a jury to find that he and Brooks were similarly situated in all material respects.  Brooks was terminated in February 2008, and Plaintiff was terminated in January 2010, nearly two years later.  Two years is a significant amount of time, and enough time for a party to evolve in their approach to discipline.  It is entirely possible that Defendants decided to be less tolerant of such behavior after terminating Brooks.  Defendants assert that Plaintiff manifested a "lack of understanding" during the disciplinary process, which went into their decision to terminate him.  Plaintiff

does not show that Brooks manifested the same behavior during the disciplinary process. Further, although the complaints about Brooks were all apparently hearsay, Plaintiff's conduct toward a passenger was witnessed directly by the District's then Deputy Director.  The Deputy Director then promptly wrote a two page incident report.  As Defendants assert, "[u]nlike complaints that passengers had made about Mr. Brooks, this incident was impossible to deny."  [Dkt. 26, Def. Br. at 12.]  This fact is material, as both Brooks and Bryant were terminated after a GNHTD official witnessed their mistreatment of a customer in violation of GNHTD's policy prohibiting such behavior.  As a result the Court finds that Plaintiff cannot show that he was similarly situated to Brooks when he engaged in similar conduct.

Even assuming Bryant was qualified to perform his job when he lacked a DOT Medical Card, he has also not produced evidence sufficient to assert a prima facie case with respect to the February 22, 2011 suspension.  Plaintiff offers no evidence, and there is no evidence from Defendant, by which to compare the severity of the discipline Plaintiff received that day, with discipline received by Brooks for a similar infraction, and thus Plaintiff has not produced evidence sufficient to make a disparate treatment claim regarding that suspension. Plaintiff offers no other evidence to establish an inference of discrimination in regards to that adverse employment event.  As a result, Plaintiff has failed to establish a prima facie case of disparate treatment with regards to the February 2011 suspension.  The Court thus grants summary judgment in favor of Defendants on all of Plaintiff's claims of disparate treatment under the ADEA.

## 2.  Retaliation

Plaintiff alleges in his amended CHRO complaint that Defendant retaliated against him for filing his original discrimination complaint with the CHRO, which was filed following his January 2010 termination.  [Compl., Ex. 4 at 4.]  In his April 4, 2011 resignation letter, Plaintiff wrote: "You Have [sic] Retaliated [sic] against me on a Daily [sic] Basis [sic] Including [sic] a 30 day suspension for being held out of work to see my cardiologist."  [Dkt. 26, Def. 56(a)(1) Statement, Ex. A-19.] The ADEA prohibits employers from discriminating against any employee "because such individual, . . . has opposed any practice made unlawful by this section, or because such individual, . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this Act."  29 U.S.C. § 623(d) (2014).  Retaliation claims under the ADEA are also analyzed under the *McDonnell-Douglas* burden-shifting test.  *Hopkins v. New Eng. Health Car. Emps. Welfare Fund*, No. 3:11-cv-1639, 2013 U.S. Dist. LEXIS 167589, at *35 (D. Conn. Nov. 25, 2013) (citing *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 94 (2d Cir. 2001)).  "In order to make out a prima facie case of retaliation, a plaintiff must show by a preponderance of the evidence '[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action.'"  *Slattery*, 248 F.3d at 94 (quoting *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 130 (2d Cir. 1996)).

In regards to element [1], Plaintiff participated in a protected activity by filing a complaint with the CHRO, and GNHTD was aware that Plaintiff had filed a

CHRO complaint when he returned to work in July 2010, as the District made a submission to the CHRO on June 3, 2010.  [Dkt. 26, Def. 56(a)(1) Statement, ¶ 19.] In regards to element [2], it is undisputed that Plaintiff has introduced evidence sufficient to satisfy the adverse employment action requirement of a prima facie case of retaliation, at least in regards to his February 2011 suspension without pay.

For the final element of a retaliation claim, "'proof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'"  *Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010) (quoting *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

Plaintiff has introduced no evidence to show disparate treatment of fellow employees following the submission of his first CHRO complaint, nor has Plaintiff offered any evidence of retaliatory animus directed against him by the Defendant. Plaintiff's only possible way of satisfying the causal element of a prima facie claim of retaliation is by relying on the timing of the relevant events. "'The Second Circuit has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action.'"  *O'Hazo*, 599 F. Supp. 2d at 261 (quoting *Farrar v. Town of Stratford*, 537 F. Supp. 2d 332, 354 (D. Conn. 2008)).  "Still, '[i]n the Second Circuit and district

24

courts within the Second Circuit, time periods greater than one year have been found, in general, to be insufficient to establish this temporal relationship.'" *O'Hazo*, 599 F. Supp. 2d at 261-62 (quoting *Wilks v. Elizabeth Arden, Inc.*, 507 F. Supp. 2d 179, 196 (D. Conn. 2007)).

"[A]s the Supreme Court has pointed out, 'cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close[] . . . .'" *O'Hazo*, 599 F. Supp. 2d at 262 (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).  "Moreover, Second Circuit precedent makes clear that the relevance of temporal proximity to the question of whether there is a 'causal nexus' between a plaintiff's protected activity and the defendant's allegedly retaliatory action will depend on the facts and circumstances of each particular case."  *Smith v. Da Ros*, 777 F. Supp. 2d 340, 357 (D. Conn. 2011) (citations omitted).  "For example, mere temporal proximity between an employee's protected activity and a subsequent adverse employment action will not support an inference of a causal connection where the employer had already begun taking adverse employment actions against the employee prior to the employee's engagement in any protected activity."  *Smith v. Da Ros*, 777 F. Supp. 2d at 357 (citations omitted).

In regards to the February 2011 suspension, that suspension occurred more than six months after he returned to work after filing his CHRO complaints,

and more than ten months since the CHRO complaint was filed in April 2010,[6] and thus the temporal relationship, standing alone, is too long to create an inference of discrimination to support a prima facie case of retaliation with regards to that suspension. *Cf. Chukwueze v. New York. City Emps. Ret. Sys.*, 891 F. Supp. 2d 443, 457 (S.D.N.Y. 2012) (finding a temporal proximity of between three and six months between plaintiff's testimony at a co-worker's discrimination hearing and the adverse employment action "insufficient, standing alone, to establish a causal connection") (citations omitted).  Even if Bryant had established a prima facie case of retaliation based on that suspension, Defendants have a legitimate non-discriminatory reason for the suspension, namely his lack of qualification. Defendants assert that Plaintiff was suspended in February 2011 for allowing his DOT Medical Card to lapse.  It is undisputed that the District's Employee Handbook warned drivers that they would be subject to discipline if they allowed their DOT Medical Card to lapse, and that the District had a widely circulated bulletin warning employees that allowing a DOT Medical Card to lapse would be grounds for termination.  [Dkt. 26, Def. 56(a)(1) Statement, ¶¶ 23-24.]  As noted above it is also undisputed that Plaintiff received a copy of that Handbook.  [Dkt. 31, Def. Opp. Br. at 6.]  Defendants' reason for giving Plaintiff a 30-day unpaid suspension was his failure to maintain a valid DOT Medical Card, and the unexcused absences that occurred when Plaintiff was unable to work because he did not have a valid DOT Medical Card.  Defendant has provided a legitimate non-

---

[6] The Court need not, and does not, reach the question of whether temporal proximity should be calculated from the date Plaintiff's CHRO complaint was filed, from the date of his return to work, or some other date.

discriminatory reason for the 30-day suspension.  As Defendant has provided a legitimate non-discriminatory reason for Plaintiff's February 2011 suspension, Plaintiff must provide evidence sufficient to show that such reasons were merely pretext for discrimination.

Plaintiff does not dispute that he was aware that he needed a valid medical card on file in order to work.  Nor does Plaintiff dispute the fact that his own union agreed that "discipline was warranted" with respect to his failure to maintain a current DOT Medical Card.  [Compl. Ex. 3 at 2.]  Instead Plaintiff appears to be alleging that the punishment was too severe, and that the severity of the punishment was driven by a discriminatory intent.  However, Plaintiff has provided absolutely no evidence to suggest any sort of discrimination at all played a role in the choice of punishment.

Plaintiff argued in the amended complaint filed with the CHRO that he should have been allowed to exhaust his available leave days before being considered to be on an unexcused absence:

> The suspension violated respondent's own policy which states that 'time taken off after all other time has been exhausted will be considered unexcused, unpaid and subject to progressive discipline' since I had personal and vacation time available to me.

[Compl., Ex. 4 at 3.]

The record reflects that Plaintiff could only have used his available leave days to cover the unexcused absences by requesting them in advance.  [Dkt. 26, Def. 56(a)(1) Statement, Ex. A-16 at 4; Dkt. 26, Def. 56(a)(1) Statement, Ex. A-17 at 2.] In fact, the record also reflects that Plaintiff knew he could choose to request leave days during that period, as Plaintiff requested and received a leave day during

that period, and Defendant did not consider that day to be an unexcused absence.  [Dkt. 26, Def. 56(a)(1) Statement Ex. A-14 at 2.].  Plaintiff has failed to establish any sort of discriminatory inference in regard to the unexcused absences related to his failure to have a current DOT Medical Card that would allow him to show that Defendants' actions were merely a pretext for discrimination.

As noted above in Part I, attached to Plaintiff's Complaint, and attached again to Plaintiff's brief in opposition to Defendants' summary judgment motion, is an August 2011 decision from the State of Connecticut Employment Security Appeals Division appeals referee, case number 995-CC-11.  This appeals referee decision describes a series of grievances filed by Plaintiff against Defendants following his return to work in August 2010, arising from disciplinary actions taken against Plaintiff and administrative errors that disadvantaged Plaintiff. On August 3, 2010, Plaintiff filed a grievance challenging the District's decision to issue him a written warning in response to a tardiness issue.  [Compl., Ex. 3 at 2.] Eleven days later the District later re-classified the warning as a verbal warning rather than a written warning.   [Compl., Ex. 3 at 2.]  Also mentioned in the appeals referee decision, one of the myriad documents attached as exhibits to the Complaint, is a grievance filed by the Plaintiff on September 30, 2010, asserting that he had been unfairly denied overtime opportunities since returning to work in July 2010.  [Compl., Ex. 3 at 2.]  The District stated that the Plaintiff was excluded from the overtime list due to a clerical error and restored his name to the list on October 14, 2010 after learning of the error.  [Compl., Ex. 3 at 2.]  The

Plaintiff neither claims that his exclusion was retaliatory nor does he offer any facts to support such a claim or tending to cast doubt on the District's explanation for his exclusion.  On November 30, 2010, Plaintiff filed a grievance asserting that he was unfairly denied a $250 stipend; on December 13, 2010 Defendant responded by giving Plaintiff the stipend.  [Compl., Ex. 3 at 2.]  On January 7, 2011, Plaintiff filed a grievance challenging a "no call/no show" absence he had been issued.  [Compl., Ex. 3 at 2.]  In response, the District reversed the issuance of the absence and compensated Plaintiff one sick day for his absence.  [Compl., Ex. 3 at 2.]  The record also indicates that Defendants issued at least four warnings for tardiness to Plaintiff following his return to work in July 2010. [*See* Dkt. 26, Def. 56(a)(1) Statement, Ex. B-4.].

Plaintiff does not allege that any of these actions supports his claim of discrimination.  Even construing Plaintiff's Complaint liberally because he is pro se, the Court finds that such allegations are insufficient to establish a prima facie claim for retaliation.  Although Plaintiff's grievances arguably have temporal proximity to Plaintiff's return to work in July 2010[7] following his submission of a CHRO complaint, there is nothing else in the facts that suggests that there was any retaliatory animus whatsoever in the actions of Defendants about which Plaintiff raised grievances.  Further, Plaintiff has not shown that any of these was an adverse employment action, as it appears that Defendants promptly responded to each of Plaintiff's grievances and resolved them in his favor.

---

[7] Although the Court declines to reach the question in this opinion, see supra footnote 6, the temporal proximity is much diminished if the April 15, 2010 filing date is the date from which temporal proximity should be calculated.

The disciplinary actions described in the appeals referee decision and documented in the record are also insufficient to establish a prima facie case of retaliation.  The record indicates that the alleged retaliatory discipline began just over two weeks after Plaintiff returned to work in July 2010 after filing his original CHRO complaint, with the first one being a written warning for excessive tardiness on July 26, 2010, which was later reduced to a verbal warning.  [Dkt. 26, Def. 56(a)(1) Statement, Ex. B-4 at 3.]  Although there is a relatively close temporal proximity between Plaintiff's return to work after filing a complaint with the CHRO and his first disciplinary action, the Court finds that the disciplinary actions are insufficient to establish a prima facie case of retaliation, as plaintiff received dozens of disciplinary citations prior to the filing of his CHRO complaint, including nearly two dozen citations for tardiness.  [*See* Dkt. 26, Def. 56(a)(1) Statement, Ex. B-4.] The temporal proximity of the disciplinary actions alone is thus insufficient to support a showing of retaliatory animus. The fact that Plaintiff had previously asserted a CHRO claim against Defendants does not automatically make every disciplinary action taken against Plaintiff to be retaliatory.  The Court grants summary judgment in Defendants' favor on Plaintiff's retaliation claims.

## 3.  Hostile Work Environment

"A hostile work environment, in violation of the ADEA and the CFEPA, occurs where 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Miller v. Ethan Allen Global, Inc.*, No. 3:10-CV-01701, 2012 U.S. Dist. LEXIS 72572, at *20

(D. Conn. May 24, 2012) (quoting *Mack v. Otis Elevator Co.*, 326 F.3d 116, 122 (2d Cir. 2003)).  "A plaintiff must demonstrate that the incidents were either 'sufficiently continuous and concerted to be considered pervasive, or that a single episode is severe enough to establish a hostile working environment.'" *Miller v. Ethan Allen*, 2012 U.S. Dist. LEXIS 72572, at *20 (quoting *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999)).  "Additionally, a plaintiff must show that she was subjected to this hostility because of her membership in a protected class, as an environment which is equally harsh for both young and old is not protected by the civil rights statutes."  *Miller v. Ethan Allen*, 2012 U.S. Dist. LEXIS 72572, at *20-21 (citing *Brennan*, 192 F.3d at 318).  "Isolated, minor acts or occasional episodes do not warrant relief."  *Miller v. Ethan Allen*, 2012 U.S. Dist. LEXIS 72572, at *21 (quoting *Brennan*, 192 F.3d at 318).

Plaintiff makes claims sounding in hostile work environment in several places in the materials before the Court.  In his Form Complaint, when asked to describe the "acts complained of in this suit" Plaintiff wrote: "Continuous Harassment [sic] in the form of false accusations and unjust discipline. Causing Physical [sic], emotional pain and anguish."  [Compl. at 3.]  In a witness list apparently submitted to the CHRO on April 18, 2010 in support of his CHRO Complaint, which asks Plaintiff to "[l]ist specifics to which this person can testify," Plaintiff wrote: "GNHTD Pattern [sic] of Harrasment [sic] & Descrimination [sic]."  [Compl. at 9.]  The findings of fact in the August 31, 2011 State of Connecticut Employment Security Appeals Division appeals referee

decision include that "claimant resigned effective April 11, 2011[8] due to perceived

discrimination and or retaliation based on his age, race, and gender."  [Compl.

Ex. 3 at 2.]  In his letter of resignation, dated April 4, 2011, Plaintiff wrote:

> It has become intolerable for me to work here any longer [sic] On Jan 25
> 2010 I was terminated without cause costing me 6 mo. wages plus
> overtime.  I filed a complaint on Mar. 4 2010 with the C.H.R.O. citing Race
> [sic] Health [sic] and age discrimination.  Since my return from the Illegal
> [sic] termination You [sic] Have [sic] retaliated against me on a Daily [sic]
> Basis [sic] Including [sic] a 30 day suspension for being held out of work to
> see my cardiologist.  this [sic] Breeches [sic] your own policy on
> absenteeism.  for [sic] these reasons and Creating [sic] a hostile work
> invironment [sic] I decline further employment effective Immediately [sic].

[Dkt. 26, Def. 56(a)(1) Statement, Ex. A-19.]

In his original CHRO complaint, Plaintiff alleged: "Upon my return to work in

August, 2009, Respondent began harassing me by constantly changing my

schedule."  [Dkt. 26, Def. 56(a)(1) Statement, Ex. A-23 at 2.]  In his Amended

CHRO Complaint, Plaintiff alleged: "From the date of my return to work and

continuing respondent has harassed me by giving me warning, putting the

person I had the altercation with (which brought about my termination) on my bus

an excessive number of times, etc." [Compl., Ex. 4 at 3.]

Plaintiff has not introduced facts sufficient to show that his workplace was

"permeated with discriminatory intimidation."  Defendant asserts, and Plaintiff

does not refute, that scheduling is done by a computer program that does not

consider the identity of drivers or clients when scheduling rides.  [Dkt. 26, Def.

56(a)(1) Statement, ¶ 36.] Nor has Plaintiff introduced any facts to show that the

---

[8]  This appears to be a scrivener's error, as Plaintiff's resignation letter is dated
April 4, 2011. [Dkt. 26, Def. 56(a)(1) Statement, Ex. A-19; *see also* Dkt. 26, Def.
56(a)(1) Statement ¶ 5.]

disciplinary actions taken against him were in any way motivated by discriminatory intent.  Plaintiff has introduced no evidence of any discriminatory intent, and has thus failed to submit evidence from which a reasonable jury could infer that Defendants' actions held any discriminatory intent.  Because Plaintiff has not shown discriminatory intimidation, the Court grants summary judgment to Defendants on Plaintiff's hostile work environment claim.

## 4. Constructive Discharge

Similar to the standard for making out a hostile work environment claim, to establish a constructive discharge claim, "a plaintiff must show that the employer 'deliberately made [her] working conditions so intolerable that [she was] forced into an involuntary resignation.'"  *Miller v. Ethan Allen*, 2012 U.S. Dist. LEXIS 72572, at *22 (quoting *Stetson v. Nynex Serv. Co.*, 995 F.2d 355, 360 (2d Cir. 1993)).  "The standard for constructive discharge is demanding, and generally will not be met simply by showing that the employee was dissatisfied with the nature of her assignments, or that her working conditions were difficult or unpleasant."  *Miller v. Ethan Allen*, 2012 U.S. Dist. LEXIS 72572, at *22 (quotation and citations omitted).  "Rather, 'a claim of constructive discharge must be dismissed as a matter of law unless the evidence is sufficient to permit a rational trier of fact to infer that the employer deliberately created working conditions that were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'"  *Miller v. Praxair, Inc.*, No. 3:05-cv-402, 2009 U.S. Dist. LEXIS 51130, at *18 (D. Conn. June 18, 2009) (quoting *Stetson*, 995 F.2d at

361)).[9]  "A constructive discharge claim must entail something more than what is required for an ordinary sexual harassment or hostile-environment claim." *Miller v. Praxair, Inc.*, 2009 U.S. Dist. LEXIS 51130, at *18 (citing *Pennsylvania State Police v. Suders*, 542 U.S. 129, 154 (2004); *Mack*, 326 F.3d at 128).

The question of whether a reasonable person in the employee's shoes would have resigned is generally left to the trier of fact, which in this case is the jury. *Miller v. Praxair*, 2009 U.S. Dist. LEXIS 51130, at *19 (citation omitted). However, "[a] claim of constructive discharge cannot survive a motion for summary judgment based only on the employee's subjective beliefs about his working conditions. Instead, the employee must present some objective evidence of intolerable working conditions." *Miller v. Praxair*, 2009 U.S. Dist. LEXIS 51130, at *19 (quoting *Zephyr v. Ortho McNeil Pharm.*, 62 F. Supp. 2d 599, 608 (D. Conn. 1999)).

Plaintiff has failed to make out a prima facie case of constructive discharge with regard to his April 4, 2011 resignation because plaintiff offers only his own conclusory assertions of discrimination, and has produced no objective evidence that a reasonable person in his shoes would have resigned.  Plaintiff has not produced any evidence that Defendants intentionally made his working conditions intolerable.  To the extent that Plaintiff's constructive discharge claim is based on the disciplinary actions taken against him, as noted above Plaintiff has produced no evidence that there was any discriminatory motive behind these

---

[9] Because "[t]he analysis of the hostile working environment theory of discrimination is the same under the ADEA as it is under Title VII", *Brennan*, 192 F.3d at 318, the Court cites to some cases discussing hostile working environment in the context of a Title VII claim rather than an ADEA claim.

disciplinary actions, and thus the Court grants summary judgment in favor of Defendants on his constructive discharge claim.  *Cf. Miller v. Praxair*, 2009 U.S. Dist. LEXIS 51130, at *20-21 (finding that plaintiff had not made out a prima facie case of constructive discharge where she had provided no objective evidence that a reasonable person in her shoes would have resigned).

Defendants also argue that Plaintiff failed to satisfy the exhaustion requirement with regard to his constructive discharge claim.  Because the Court finds that Plaintiff has failed to make out a prima facie case of constructive discharge, the Court declines to reach Defendants' exhaustion argument.  The Court grants summary judgment in Defendants' favor on Plaintiff's constructive discharge claims.

## C. Rehabilitation Act Claims

"To establish a prima facie case of discriminatory termination in violation of the Rehabilitation Act of 1973, a plaintiff must show (1) that the plaintiff is handicapped within the meaning of the Act; (2) that the plaintiff is otherwise qualified to perform the job; (3) that the plaintiff was discharged because of his or her handicap; and (4) that the employer is a recipient of federal financial assistance." *Kinsella v. Rumsfeld*, 320 F.3d 309, 314 (2d Cir. 2003) (citation omitted).  After the plaintiff has established a prima facie case, the burden shifts to the defendant to provide a legitimate non-discriminatory reason for the discharge.  *Id.*  "The plaintiff retains the ultimate burden of persuasion and must show, using 'evidence constituting the prima facie case, together with supportable inferences to be drawn from the false or erroneous character of the

employer's proffered reason,' . . . that the defendant's proffered reason was pretextual." *Id.* (quoting *Carlton*, 202 F.3d at 134-35).  "Summary judgment is appropriate . . . only if the employer's nondiscriminatory reason is dispositive and forecloses any issue of material fact."  *Id.* (quoting *Carlton*, 202 F.3d at 135).

Defendants argue that Plaintiff has not established two of the required elements of a prima facie case under the Rehabilitation Act, asserting that he has not presented facts to satisfy the first element, that he is handicapped within the meaning of the Act, or the third element, that he was discharged because of his handicap.

The Rehabilitation Act draws its definition of "disabled" from the ADA, 42 U.S.C. § 12102.  *See* 29 U.S.C. § 705(20)(B) (2014) ("the term 'individual with a disability' means, . . . any person who has a disability as defined in section 3 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12102).").  "In order to qualify as an individual with a disability under the ADA plaintiff must: (1) have 'a physical or mental impairment that substantially limits one or more of the major life activities of such individual;" (2) have 'a record of such an impairment'; or (3) be 'regarded as having such an impairment.'"  *Mitchell v. Girl Scouts of the U.S.A.*, No. 98 CV 3730, 2003 U.S. Dist. LEXIS 20570, at *15 (S.D.N.Y. Nov. 17, 2003) (quoting 42 U.S.C. § 12102(2)(A)-(C)).  "With respect to the first and second definitions, a showing of an impairment alone is insufficient to qualify as a disability."  *Mitchell*, 2003 U.S. Dist. LEXIS 20570 at *15-16 (citing *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 195 (2002)).  "To establish such an impairment, the plaintiff must show (1) the presence of a mental of physical

impairment, (2) that the impairment affects a 'major life activity,' and (3) that the impairment 'substantially limits' this major life activity."  *Garvin v. Potter*, 367 F. Supp. 2d 548, 561 (S.D.N.Y. 2005) (citing *Toyota*, 534 U.S. at 194-95).  "The regulations to the ADA define the phrase 'major life activities' as those basic functions 'such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working.'"  *Mitchell*, 2003 U.S. Dist. LEXIS 20570 at *16 (quoting 29 C.F.R. § 1630.2(i)).  This is a non-exclusive list, and the Second Circuit has identified other major life activities "including sitting, standing lifting, reaching, and sleeping."  *Mitchell*, 2003 U.S. Dist. LEXIS 20570, at *16 (citations omitted).  "[M]ajor life activities 'refer to those activities that are of central importance to daily life.'"  *Mitchell*, 2003 U.S. Dist. LEXIS 20570, at *16-17 (quoting *Toyota*, 534 U.S. at 197).  "Because the Rehabilitation Act regulations provide no guidance as to what constitutes a 'substantial limitation,' Second Circuit courts have looked to EEOC regulations implementing the ADA, which define the term to mean: '(i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.'"  *Garvin*, 367 F. Supp. 2d at 561 (quoting *Colwell v. Suffolk Cnty. Police Dep't*, 158 F.3d 635, 643 (2d Cir. 1998)).

The Court agrees that Plaintiff has not presented facts sufficient to establish the first element, as Plaintiff has failed to introduce evidence sufficient

to show that Plaintiff is disabled within the meaning of the Act.  Although the record indicates that Plaintiff had a heart condition that required him to be out of work in the summer of 2009, the record also indicates that Plaintiff's cardiologist cleared Plaintiff to return to work on July 31, 2009.  The record also indicates that a cardiologist again opined in February 2011 that there should not be any limitations on Plaintiff's physical or work-related activities.

Plaintiff's interrogatory answers in the record provide no support for Plaintiff's claim of disability.  When asked in an interrogatory from Defendants to "[s]pecify any disability from which you suffered that you claim was covered by the Rehabilitation Act of 1973 . . .", Plaintiff responded "various health issues." [Dkt. 21, Ex. 1 at 6.]  When asked in an interrogatory from Defendants to "[s]pecify any disability from which you suffered that you claim was covered by the Americans with Disability Act of 1990", Plaintiff responded "Personal Information."  [Dkt. 21, Ex. 1 at 7.]

Plaintiff instead offers only conclusory allegations of discrimination. Plaintiff asserts, in response to one of the Defendants' interrogatories, that "at a step 2 Greivance [sic] in 2008 I told Transit about my health issues [sic] Transit laughed [sic] Including al [sic] Naudus and since deceased Denise O'Hara".  [Dkt. 21, Ex. C at 4.][10]  Plaintiff asserts, in response to an interrogatory asking him to identify each oral communication supporting his allegation, wrote "allowing other

---

[10] Although this response was provided to a line of questions regarding Plaintiff's Title VII claim, in light of Plaintiff's *pro se* status and in the interest of viewing the evidence in the light most favorable to the Plaintiff, the Court will treat this evidence as having been asserted in support of his Rehabilitation Act and ADA claims for the purposes of this summary judgment decision.

workers to work duty lighter than normal [sic] witnesses will be on witness list"[11], and "Transit told me There [sic] was no light duty to wich [sic] I have Evidence in the form of witnesses".   [Dkt. 21, Ex. 1 at 5.]

Plaintiff has introduced no evidence to show that he has a physical or mental impairment that substantially limits one or more of his major life activities. Even assuming that Plaintiff has a serious heart condition, Plaintiff has introduced no evidence that this heart condition "substantially limits" any major life activity.  As a result, Plaintiff has failed to establish a prima facie claim under the Rehabilitation Act, and the Court grants summary judgment in favor of Defendants on this claim.  *Cf. Burke v. Niagara Mohawk Power Corp.*, 142 Fed. Appx. 527, 529 (2d Cir. 2005) (summary order) (affirming lower court's grant of summary judgment in favor of defendant on plaintiff's ADA claim for discriminatory discharge for failure to state a prima facie case where plaintiff did not show that her asthma affected her ability to work in general); *Garvin*, 367 F. Supp. 2d at 562 (finding that plaintiff's "inability to walk quickly or to walk for over eight hours" is not a substantial limitation on a major life activity, and that plaintiff thus was not a "disabled person" under the Rehabilitation Act and granting summary judgment for defendant).  Because the Plaintiff failed to establish the first element of a prima facie claim, the Court need not and will not reach Defendants' argument regarding the third element.

---

[11] Again, although this response was provided to questions regarding Plaintiff's ADEA and Rehabilitation Act claims, the Court will treat this evidence as having also been asserted in support of his ADA claim for the purposes of this summary judgment decision.

The ADA's definition of disabled allows a plaintiff to assert a claim if they are "regarded as having such an impairment" regardless of whether there actually is such an impairment.  "An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A) (2014). Plaintiff has introduced no facts whatsoever to show that Defendants perceived him as having a disability. Although Defendants received correspondence from Plaintiff's cardiologist in 2009 and 2011, there is no evidence that Defendants perceived Plaintiff as having a disability.  In fact, the correspondence Defendants received from Plaintiff's cardiologist on July 31, 2009 stated that Plaintiff was "OK to return to work", [Dkt. 26, Def. 56(a)(1) Statement ¶ 46].  In March 2011 Defendants again received a letter from Plaintiff's cardiologist verifying that there should be no limitations on Plaintiff's work-related activities, [Dkt. 26, Def. 56(a)(1) Statement ¶ 47].  Defendants assert that once they received the July 31, 2009 letter, they were "aware of no condition that would render Mr. Bryant unable to fulfill all of the duties of his Transit Driver position."  [Dkt. 26, Def. 56(a)(1) Statement ¶ 47.]  Plaintiff has thus failed to show that Defendants perceived him as having a disability, and the Court grants summary judgment in favor of Defendants on this claim.

To the extent Plaintiff seeks to raise retaliation, hostile work environment, and/or constructive discharge claims under the Rehabilitation Act, the Court

grants summary judgment in favor of Defendants on such claims for the same reasons explained above in Parts III.B.2-4.

## D.  ADA Claims

"A plaintiff asserting a violation of the ADA must prove that: (1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of his disability or perceived disability."  *Capobianco v. City of New York*, 422 F.3d 47, 56 (2d Cir. 2005) (citation omitted).  In order to bring a failure to accommodate claim, a plaintiff must demonstrate: "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *McMillan v. City of New York*, 711 F.3d 120, 125-26 (2d Cir. 2013) (quotation omitted).  "Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in [*McDonnell-Douglas*]." *McMillan*, 711 F.3d at 125 (quotation omitted).  Defendants assert that Plaintiff has failed to introduce facts sufficient to satisfy either the second or fourth elements of a prima facie case of discrimination under the ADA.  Defendants also argue that Plaintiff has failed to assert a claim for failure to accommodate because there is no evidence that he requested accommodation, and that even if he had requested

41

accommodation, they had a legitimate non-discriminatory reason for not giving Plaintiff light duty.

The analysis in regards to whether a plaintiff is disabled within the meaning of the ADA is the same for both Plaintiff's Rehabilitation Act claim and his ADA claim.  *See, e.g.*, *Kearney v. New York State Dep't of Corr. and Cmty. Supervision*, 9:11-CV-1281, 2013 U.S. Dist. LEXIS 140932, at *15 (N.D.N.Y. July 31, 2013) ("Because the elements of Plaintiff's ADA and the Rehabilitation Act claims for disability discrimination are the same, the court considers these claims together and applies a single analysis to both.") (citing *Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999)).  Because the Court has already found in its analysis of Plaintiff's Rehabilitation Act claims that Plaintiff has failed to prove that he suffers from a disability within the meaning of the ADA, the Court finds that Plaintiff has failed to introduce evidence sufficient to prove the second element of an ADA discrimination claim, or the first element of a failure to accommodate claim.  As such, the Court need not consider the Defendants' other arguments with regards to Plaintiff's ADA claims.  Plaintiff has also failed to raise a claim for discrimination based on perceived disability for the same reasons stated above in Part III.C.

The Court grants summary judgment in favor of Defendants on Plaintiff's ADA claims.  To the extent Plaintiff seeks to raise retaliation, hostile work environment, and/or constructive discharge claims under the ADA, the Court grants summary judgment in favor of Defendants on such claims for the same reasons explained above in Parts III.B.2-4.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment on Plaintiff's ADEA, ADA, and Rehabilitation Act claims is GRANTED as to all defendants.  Additionally, the Court grants summary judgment in favor of defendants Naudus and Carter on Plaintiff's Title VII claim.  The only claim remaining is Plaintiff's Title VII claim as to defendant GNHTD.  The Clerk is directed to terminate defendants Alan Naudus and Donna Carter ONLY as defendants in this action.

IT IS SO ORDERED.


_____/s/_____
**Hon. Vanessa L. Bryant**
**United States District Judge**

**Dated at Hartford, Connecticut: March 25, 2013**